# Richmond

GRAT DAY V. COMMONWEALTH OF VIRGINIA.

April 26, 1948.

Record No. 3364.

Present, Hudgins, C. J., and Gregory, Eggleston, Spratley, Buchanan and Miller, JJ.

The opinion states the case.

*S. H.* and *George C. Sutherland,* for the plaintiff in error.

*Harvey B. Apperson, Attorney General,* and *Ballard Baker, Special Assistant,* for the Commonwealth.

HUDGINS, C. J., delivered the opinion of the court.

This writ of error brings under review the proceedings of a trial which culminated in the conviction of the accused on the charge of attempted rape of Irene Sweet, a girl over fifteen but under sixteen years of age.

About 1:00 p. m. on Sunday, April 13, 1947, the accused, Chester Mullins, Irene Sweet, and Ethel White accidentally met at Mullins' garage in Whitewood, Buchanan county. Mullins, who was married although not living with his wife, had had several dates with Ethel, who was about eighteen years of age and a close friend of Irene Sweet. Neither of the girls knew the accused. However, neither objected to accepting Mullins' invitation to take a drive with the accused in his car although he told them at the time that he was a married man.

Ethel and her friend, Mullins, sat on the back seat. Irene rode on the front seat with the accused as they drove about twenty miles over the mountains to Alva Horn's in West Virginia. There the two men went into the restaurant, bought five or six bottles of beer and other refreshments. The girls, who remained in the car, declined to drink any beer.

On the return to Whitewood they stopped and parked on the side of the road. Mullins and Ethel walked up the mountain just out of sight of the highway and remained twenty or thirty minutes. The accused and Irene stayed in the car and there hugged and kissed each other. Irene stated that the accused pinched her legs, but that she made no complaint either to him or to her friends when they returned. Several other stops were made on the return journey.

Irene was seen by Walter Rife, and others who passed them on the road, to be sitting as close to the accused as she could get with her hands over her face, apparently

attempting to conceal her identity, and "looked like she was enjoying herself."

The car seems to have been driven aimlessly around the neighborhood until after dark. The girls were not anxious to leave the men although several times they passed near the entrances to their homes. Between 7:00 and 8:00 o'clock, after the lights were turned on, they drove past the entrance to Irene's home. She decided to go one or two miles further to the entrance to Ethel's home and ride back with the accused to her home. When Ethel got out of the car Mullins decided to walk with her part of the half-mile to her house and arranged to join the accused at some point farther down the main highway.

The testimony of Irene and the accused is in sharp conflict as to the incidents which occurred after Mullins and Ethel left the car. The accused states that after he had gone up the road two or three miles and turned to go back, Mack Church's car passed him and Irene looked scared and said, "Lord there goes Mack, he will go down there and tell Daddy I am up here with a married man and he will come up here and kill both of us." And she said, "Let me out and I will go over to Uncle Jay's and they will think I have been over there all evening." Irene then got out of the car and went to Jay Cole's home which was between 200 and 300 feet from the road. The accused said that he never touched or did anything to Irene to which she objected. He said, "I did have a date with her after that to meet her at Whitewood, she was to be in my car when the party was over graduation night or something."

Irene testified that:

"A. We turned at Henry Street's and came back down on the hill above Jay Cole's and he got to acting funny again, feeling around and he said, 'Irene, it is put out or else' and I said, 'It will be else then', and he said, 'You are not ready to die yet', and he jerked up my dress and he opened his pants and took out his private, and he started to and I kept fighting and he said, 'I am going to kill you and put you in that damn creek', and I was crying and he

said, 'You better not cry, I will kill you', and I got out again and he had hold of me, my arm, and I was trying to get away from him and he slung me down and kicked me.

"Q80. Then what happened?

"A. He still had hold of my arm and he pulled me back up there, and I got in and sat there and he started around to get in and when he started around the car to get in, I jumped out of the car and ran.

"Q81. What did he do?

"A. He started after me and then he turned and went back.

"Q82. Were you in sight of Jay Cole's house then?

"A. We were on the hill above Jay's, just little piece and I ran over to Jay Cole's and told them what this man was trying to do."

As morally reprehensible as the conduct of the accused to this teen-age girl is shown to have been, he should not be convicted of attempted rape unless the evidence is sufficient to establish beyond a reasonable doubt that he made an assault upon the prosecutrix with intent to have carnal knowledge of her by force and violence against her will.

██ The conviction rests solely upon the testimony of the prosecutrix which is wholly uncorroborated in the most essential particulars. Mr. Justice Gregory, speaking for the Court in *Addington* v. *Commonwealth*, 161 Va. 975, 978, 170 S. E. 565, said: " * * * If her (the prosecutrix's) testimony is credible, it is sufficient, for a conviction of rape may be sustained upon the uncorroborated testimony of the prosecutrix if the guilt of the accused is believed by the jury beyond a reasonable doubt. *Stump* v. *Commonwealth*, 137 Va. 804, 119 S. E. 72. But to sustain a conviction of rape upon the uncorroborated testimony of the prosecutrix, her testimony must not be inherently incredible. *Vance* v. *Commonwealth*, 155 Va. 1028, 154 S. E. 512, 513; *Grinnelle* v. *Commonwealth*, 157 Va. 915, 161 S. E. 888."

The prosecutrix admits, what the testimony of other witnesses established, that she had been riding with the accused from six to seven hours during which time she had permitted

him to hug, kiss, and fondle her; that they had talked about spending a night together at a hotel in Bluefield; that she had agreed to slip in his car at night after the graduation exercises at the high school. She did not seem to have been resentful of or even to have objected to the conduct of the accused or the propositions which he made to her.

Under these circumstances it seems incredible that a man would attempt to commit rape on a much-travelled highway within 300 feet of a well-lighted dwelling when by going a little farther in either direction he could have reached a more secluded spot. The girl weighed 100 pounds. The accused was twenty-two years of age and weighed 180 pounds. He could have easily held the girl in the car with one hand. Yet she said she broke loose from him at least twice, got out of the car, fighting and crying all the time, trying to get away. He finally put her in the two-door car, turned her loose, and deliberately walked around the rear to get in under the steering wheel. If the accused was determined to have intercourse with her by force and violence against her will, he would hardly have so released her.

This testimony standing alone is not convincing. When considered with the testimony of Jay Cole and his daughter its incredibility becomes apparent.

The prosecutrix stated that she ran from the scene to Jay Cole's home which was within 300 feet of the scene. She said she did not stop on the way. She must have reached the house in less than thirty seconds. Jay Cole, a witness introduced by the accused, stated that he had been deputy sheriff and a member of the Board of Supervisors of Buchanan county; that when he heard the prosecutrix talking to his daughter he asked her in and made her sit down and tell him about it. When she told him that the accused, in attempting to rape her, had knocked her down and kicked her he observed her carefully. Her manner was calm and composed. Her voice was cool and collected. There were no indications of excitement. Her clothes were not dusty, dirty, or rumpled; her hair was not disheveled;

and there were no marks, scratches, or bruises upon her person. She appeared perfectly normal.

It is incredible that a young girl, or an adult woman for that matter, could have been subjected to the excitement, the prolonged fight, and harrowing experience in protecting her virtue as claimed by the prosecutrix, yet within a half a minute thereafter she could have regained her composure so that there remained no visible effects of the struggle in her voice, her manner, or upon her person or clothing.

In reaching this conclusion we are not unmindful of the force and effect of a jury's verdict approved by the trial court, but we have held time and again that we are not required to believe that which we know from human experience is inherently incredible. "What we know as men we are not required to forget as judges." *Legions* v. *Commonwealth*, 181 Va. 89, 23 S. E. (2d) 764.

Inasmuch as we have no reason to think that the Commonwealth will be able to strengthen its case by the introduction of additional evidence should a new trial be awarded, we reverse the judgment, set aside the verdict, and remand the case with directions to dismiss the accused from further prosecution under the indictment.

*Reversed and remanded.*